IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 21, 2026 Session

## STATE OF TENNESSEE v. JOHNNY MACK POWELL

**Appeal from the Criminal Court for Knox County**
**No. 113007      Scott Green, Judge**

_____

### No. E2025-01126-CCA-R3-CD

_____

A Knox County jury convicted the Defendant, Johnny Mack Powell, of one count of attempted voluntary manslaughter, three counts of aggravated assault, one count of possession of marijuana, one count of possession of drug paraphernalia, and one count of trespassing. The trial court merged the aggravated assault convictions and sentenced the Defendant, a Range II offender, to ten years of incarceration. On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions for attempted voluntary manslaughter and aggravated assault because he was not the first aggressor and because he acted in self-defense. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, PJ., delivered the opinion of the Court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Joshua Hedrick, Knoxville, Tennessee, for the appellant, Johnny Mack Powell.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Fitzgerald and Robert Debusk, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from an altercation between the Defendant and Darron Blackwell, which occurred on January 28, 2018, in the Western Heights housing development in Knox County. For his role in the altercation, a Knox County grand jury indicted the Defendant for attempted first degree murder, three counts of unlawful possession of a firearm,

aggravated assault by causing serious bodily injury, aggravated assault by causing bodily injury while using or displaying a deadly weapon, aggravated assault by causing reasonable fear of imminent bodily injury while using or displaying a deadly weapon, possession of marijuana, possession of drug paraphernalia, and trespassing. The trial court severed the Defendant's three firearm charges before trial.

At the trial, the parties presented the following evidence: Stephanie Pinkston testified regarding the 911 recordings, which she kept as part of her business records working for Knox County 911. In those calls, the callers identify two black men fighting. One man, in a white shirt and jeans, later identified as the Defendant, was reported to be holding a gun to the back of the other man's head. The other man, later identified as Mr. Blackwell, was wearing a dark hoodie. The Defendant told Mr. Blackwell he was going to "blow his f***ing head off" while pulling the trigger of his gun, but the gun did not discharge. The men went down a grassy embankment, lost their footing, and the Defendant abandoned the gun and pulled out a knife, which he used to slit Mr. Blackwell's throat. The Defendant ran away, and Mr. Blackwell retrieved his own weapon from his person, and discharged it, firing toward the Defendant. After this, Mr. Blackwell got into a white SUV and left the scene. The Defendant went between the buildings and was no longer visible. One caller informed 911 that he had the weapon he had seen the Defendant hold to the back of Mr. Blackwell's head. Another caller called to inform officers she had found a .40 caliber shell casing.

Jamie Mitchell said that on January 28, 2018, she was living in Western Heights and heard a confrontation outside her window that included a gunshot. She looked outside and saw the Defendant, who was wearing a white shirt, "bracing" Mr. Blackwell from behind. Mr. Blackwell was "struggling" and "trying to get away" from the Defendant. Mr. Blackwell appeared to be trying to get away from the Defendant who then grabbed something out of his pocket and "motioned" something across Mr. Blackwell's throat. Mr. Blackwell grabbed his throat and got away and ran to a white vehicle, which sped away. The Defendant ran toward Ms. Mitchell's building. Ms. Mitchell was describing the incident to 911 when she saw the Defendant come out of the building and run towards Virginia Street. She called to police officers who had arrived and told them about the incident and pointed to the Defendant, whom they arrested. Ms. Mitchell described the Defendant as the aggressor in the incident.

The final 911 call appears to be from the Defendant. He called 911 and said that Mr. Blackwell tried to rob him and then shot at him. He was unsure whether he was shot.

A video of the incident, recorded by a cell phone from another cell phone, which was not entirely clear, was played for the jury. It showed the Defendant and Mr. Blackwell wrapped in what appeared to be an embrace. The Defendant held a gun to the back of Mr.

2

Blackwell's head. The men went down a grassy embankment and were then out of view. The Defendant ran back into camera view and away from the crime scene. Mr. Blackwell appeared to wave to a white SUV that was stopped in the road in the same direction Mr. Blackwell was traveling. The SUV appeared to stop and allow Mr. Blackwell to enter the vehicle.

During cross-examination, Ms. Mitchell agreed that she did not look outside until after she heard the gunshot. She was upstairs in her home and went downstairs to look outside, so there was a period of time when she was not actively looking outside. She maintained that she saw the Defendant grab something from his pocket and run it across Mr. Blackwell's throat. Mr. Blackwell "broke away" and ran to the white SUV, which appeared to be waiting for him, and which then sped away. Ms. Mitchell said she only heard the one gunshot.

The parties stipulated to a document that was a Knoxville Community Development Corporation ("KCDC") trespass notice to the Defendant. The parties agreed that this was served upon the Defendant before this incident.

Jason Culvahouse, a patrol officer with the Knoxville City Police Department ("KCPD") responded to this incident, along with Officer Kevin Varner and a K-9 officer. After getting witness statements about two men fighting, one of whom was a tall black male in a white shirt, the officers cordoned off the area and located the Defendant. They took him into custody. A witness present, Garrick Jones, gave Officer Culvahouse a Ruger .22 pistol.

During further examination, Officer Culvahouse testified that officers also found a .40 caliber shell casing, which could not be fired from a Ruger .22 pistol. Officers did not recover any .22 caliber shell casings.

Stephanie Martinez, who knew the Defendant by his nickname "Country," also witnessed this incident. She was walking in Western Heights when she saw a white vehicle arrive, and Mr. Blackwell[1] "jumped out" and yelled "there's the guy that robbed us." Mr. Blackwell "ran up on" the Defendant, and the two started "tussling." The Defendant grabbed Mr. Blackwell around his chest area and the two men struggled for a while. Then, the Defendant had a gun to the back of Mr. Blackwell's head and was yelling "come get some of this gun" while the two men were walking down a steep incline. At the bottom of the hill, Mr. Blackwell appeared to be trying to pull out his gun when the Defendant "sliced his throat." The Defendant then fled, and Mr. Blackwell fired a shot after him.

---

[1]The witness referred to Mr. Blackwell by his alias "D. Parker."

3

The same day as this incident, Ms. Martinez gave a statement to Investigator Mike Washam. Ms. Martinez further recounted that she found a gun after the incident on the sidewalk at the bottom of the hill. She gave the gun to her neighbor, Mr. Garrick Jones. Ms. Martinez said that the Defendant was the first person to brandish a weapon and that Mr. Blackwell did not reach for his gun until after the Defendant held a weapon to the back of his head.

During cross-examination, Ms. Martinez said that she saw the Defendant before the white SUV arrived and he appeared to be minding his own business. The white SUV arrived, and Mr. Blackwell got out and started yelling immediately. She agreed he was "aggressive" and "going after" and "running up on" the Defendant. The Defendant grabbed Mr. Blackwell and restrained him but did not hit him, and it appeared he was doing so to prevent Mr. Blackwell from reaching for his weapon. Mr. Blackwell did not stop struggling and was still aggressively trying to get at the Defendant. The Defendant could not stop him, so he said, "come get some of this gun." Mr. Blackwell did not stop, and the men struggled down the hill. The men slipped and lost their footing, and Mr. Blackwell got free enough to draw his weapon. When Mr. Blackwell drew his weapon, the Defendant cut his throat and then ran away.

Mr. Blackwell then fired his weapon, and everyone scattered. Ms. Martinez went back to retrieve the weapon to keep it out of the hands of the kids who were present in the neighborhood.

Charles Stiltner also witnessed this incident. He was with his son and Mr. Blackwell, whom Mr. Stiltner did not know, in a white SUV that belonged to Mr. Stiltner's daughter. Mr. Stiltner's son was driving, and Mr. Blackwell was in the vehicle when the two men picked up Mr. Stiltner at the Dollar Store. Mr. Stiltner's son drove them through "the projects."

While there, Mr. Stiltner's son stopped the vehicle, and Mr. Blackwell got out, went up some steps between two buildings, and got into a "tussle" with the Defendant. The Defendant had pulled a gun and placed it on the back of Mr. Blackwell's head. Mr. Stiltner heard the gun click. From there, the two men were "scuffling around" and started down a grass embankment. The Defendant threw down the pistol, grabbed a knife, and cut Mr. Blackwell's throat.

During cross-examination, Mr. Stiltner agreed he told investigators that Mr. Blackwell went up the steps and leaned on the railing with his hands inside his jacket. He also agreed he told investigators that the Defendant started backing up, while Mr. Blackwell's hands were in his jacket. The Defendant then grabbed Mr. Blackwell, and it appeared Mr. Blackwell was trying to get a hold of something inside his jacket.

4

During further direct examination, Mr. Stiltner said that, when the Defendant placed the gun on the back of Mr. Blackwell's head, Mr. Blackwell appeared to be trying to reach that gun.

During further cross, Mr. Stiltner said that, when Mr. Blackwell got into the SUV after the attack, he suggested they take him to the hospital. Mr. Blackwell refused and got out of the vehicle sometime later. Mr. Stiltner did not know where he went.

Mr. Blackwell testified that, at the time of trial, he was forty-six years old. He grew up in Knoxville and had graduated high school. On the day of this incident, the Defendant had come to his house between 9:00 or 10:00 p.m. He was upset about something to do with his girlfriend and said he did not trust her. Mr. Blackwell reassured him it was going to be all right, and the Defendant left.

Mr. Blackwell said he was walking down the road, saw two women he knew, and stopped to talk to them. He saw the Defendant in his peripheral vision, and the Defendant came at him with a gun saying, "[D]on't move, turn around." Mr. Blackwell turned around. The Defendant grabbed him by his neck and said, "shut up before I kill you." Mr. Blackwell heard the click of the gun, and he started to grab his arm. The next thing he knew, he was going down the hill and his neck was bleeding. He got up and walked away holding his neck.

Mr. Blackwell said that, after he got up, a man in a white SUV said his name. He got into the vehicle, and the men in the vehicle offered to take him to the hospital. He refused and asked them to take him to his girlfriend's house. His girlfriend then took him to the hospital from which he was transferred to UT hospital for surgery. Despite treatment, the injury caused him to lose feeling in the right side of his face.

Mr. Blackwell agreed he had an aggravated assault conviction from 2016 and at the time of trial was serving a federal sentence for conspiracy to distribute fentanyl.

During cross-examination, Mr. Blackwell agreed that his assault conviction occurred a little more than a year before the incident in this case. Four years later, he was convicted related to the fentanyl. Mr. Blackwell said that he did not come to the scene in a white SUV. He never had a gun. He never fired a gun. He was a convicted felon at the time and was not allowed to possess a gun. Mr. Blackwell said that the men in the white SUV just happened to be present at the scene and offered to give him a ride.

Mr. Blackwell said he never confronted the Defendant and never approached him. The Defendant just came up to him with a gun, grabbed him from behind, and pointed the

5

gun at his head. When they went down the hill, the Defendant lost his grip. The Defendant then pulled out a knife and cut him.

Investigator Kevin Warner with the KCPD testified that Western Heights was a housing project within a residential area. The property was owned by the KCDC, which had issued a trespass notice for the Defendant prior to the incident in this case.

Investigator Warner responded to the incident in this case, and the parties had fled after the altercation. He canvassed the area, and his body camera footage showed the Defendant walking while carrying a blue backpack and a white shirt. During a search of the Defendant, officers confiscated a box cutter, two glass marijuana pipes, a scale, and marijuana.

During cross-examination, Investigator Warner agreed that law enforcement had seized a .22 Ruger involved in this case. They also found a .40 caliber shell casing, meaning that there was likely another gun involved, but it was never found.

Based upon this evidence, the jury convicted the Defendant of one count of the lesser included offense of attempted voluntary manslaughter, three counts of aggravated assault, which the trial court merged, one count of possession of marijuana, one count of possession of drug paraphernalia, and one count of trespassing. The trial court sentenced the Defendant to eight years for the attempted voluntary manslaughter and ten years for the aggravated assault conviction. It ordered that the sentences be run concurrently for a total effective sentence of ten years. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to support his convictions for attempted voluntary manslaughter and aggravated assault because the proof showed that Mr. Blackwell began the confrontation and used deadly force first and further proved that the Defendant acted in self-defense. The Defendant argues that the State's witnesses contradicted each other and that there is physical evidence contradicting much of that testimony. Finally, he asserts that no rational jury could have found him guilty. The State counters that there was sufficient evidence to sustain both these convictions as the evidence showed that the Defendant attempted but failed to shoot Mr. Blackwell and that he slit his throat with a box cutter. The jury, the State posits, resolved any dispute in testimony by its verdict.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a

6

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a

defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

## A. Attempted Voluntary Manslaughter

The Defendant was convicted of attempted voluntary manslaughter for his action of squeezing the trigger while the gun was pointed at the back of Mr. Blackwell's head. He asserts that the evidence is insufficient to sustain his conviction because the evidence proved that Mr. Blackwell was the aggressor, because Mr. Blackwell used deadly force first, and because the Defendant acted in self-defense. The State asserts that the evidence is sufficient to sustain the conviction of attempted voluntary manslaughter. We agree with the State.

The Defendant, originally charged with attempted first degree murder, was convicted by the jury of attempted voluntary manslaughter. "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). Attempt is defined as follows:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
> (b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

T.C.A. § 39-12-101(a), (b).

As previously stated, conflicts in the testimony (including between the State's witnesses) are resolved in favor of the verdict of the jury, and the state is entitled to the

8

strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982) (citing *State v. Cabbage*, 571 S.W.2d 832 (Tenn. 1978)); *see also State v. Grace*, 493 S.W.2d 474 (Tenn 1973). We note that the jury rejected the State's position that the Defendant committed attempted first degree or second degree murder. And, while it rejected his claim of self-defense, it found that he acted "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Accordingly, it convicted him of the lesser-included offense of attempted voluntary manslaughter.

Viewing the evidence in that light, it proved that Mr. Blackwell jumped out of a white SUV and approached the Defendant while saying "there is the man who robbed us." The two men engaged in a physical altercation, and the Defendant was the first to brandish a gun. He held the gun to the back of Mr. Blackwell's head and attempted to fire it. The gun did not discharge. The jury determined that the Defendant was "sufficiently provoked . . . to act in an irrational manner" and so was guilty of attempted voluntary manslaughter. It was within the prerogative of the jury to reject the claim of self-defense. It is well settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). The evidence was sufficient for a rational juror to conclude beyond a reasonable doubt that the Defendant was guilty of attempted voluntary manslaughter.

### B. Aggravated Assault

The Defendant was found guilty of three counts of aggravated assault. The first count was based on the serious bodily injury suffered by Mr. Blackwell when his throat was cut, the second based on the bodily injury by use or display of a deadly weapon because he used a box cutter to cut Mr. Blackwell's throat, and the third based on Mr. Blackwell's fear of imminent bodily injury because the Defendant displayed a gun and held the gun to the back of Mr. Blackwell's head and attempted to fire it. The Defendant maintains that the evidence is insufficient because Mr. Blackwell was the aggressor and because the Defendant acted in self-defense. The State counters that there was sufficient evidence presented to support the Defendant's convictions for aggravated assault. We note that the trial court merged the convictions, but we will discuss the sufficiency of each of the three aggravated assault convictions.

Pursuant to Tennessee Code Annotated section 39-13-101:

(a) A person commits assault who:

9

(1) Intentionally, knowingly or recklessly causes bodily injury to another;

(2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or

(3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

Further, pursuant to Tennessee Code Annotated section 39-13-102:

(a)(1) A person commits aggravated assault who:

(A) Intentionally or knowingly commits an assault as defined in § 39-13-101, and the assault:
(i) Results in serious bodily injury to another;
(ii) Results in the death of another;
(iii) Involved the use or display of a deadly weapon; or
(iv) Involved strangulation or attempted strangulation; . . .

### 1. Aggravated Assault – Serious Bodily Injury

The jury convicted the Defendant for aggravated assault based on his assault as defined in section 39-13-101 that resulted in serious bodily injury to another. "Bodily injury" includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" T.C.A. § 39-11-106(a)(2). Serious bodily injury is defined as bodily injury involving: "(A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; [or] (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" T.C.A. § 39-11-106(a)(34).

Upon review, we conclude that the evidence is sufficient to establish the serious bodily injury element of aggravated assault. The evidence proved that the Defendant first attempted to shoot Mr. Blackwell in the back of the head and, when his gun did not fire, he abandoned the gun, got out a box cutter, and slit Mr. Blackwell's throat. The jury saw the pictures of the injury, the staples in Mr. Blackwell's throat, and the resulting scar. This evidence supports the jury's finding that Mr. Blackwell suffered serious bodily injury. As previously stated, any conflicts in testimony are resolved by the jury's verdict and must be considered by this court in favor of that verdict. Further, the jury acts within its prerogative

10

when it rejects a claim of self-defense.  As such, we conclude that the evidence is sufficient to sustain the jury's verdict.

## 2. Aggravated Assault – Display

The Defendant was convicted of aggravated assault for his use or display of a deadly weapon, that weapon being the box cutter that the Defendant used to slit Mr. Blackwell's throat.  A "deadly weapon" includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."  T.C.A. § 39-11-106(a)(5)(B).  A box cutter is a deadly weapon.  *State v. Liddle*, No. W2005-00780-CCA-R3-CD, 2006 WL 2872473, at *4 (Tenn. Crim. App. Oct. 9, 2006) (citing *State v. Eaves*, 959 S.W.2d 601, 604 (Tenn. Crim. App. 1997)), *no Tenn. R. App. P. 11 app. filed*.

The evidence proved that the Defendant retrieved a box cutter from his person and that he used that box cutter to slit Mr. Blackwell's throat.  The use of the box cutter constitutes the use of a deadly weapon for purposes of this count of aggravated assault. The evidence is sufficient to sustain his conviction.

## 3. Aggravated Assault – Reasonable Fear from Display of a Weapon

The jury convicted the Defendant of aggravated assault for his action of holding the gun to the back of Mr. Blackwell's head and attempting to fire the weapon.  As previously stated, aggravated assault occurs when a person intentionally or knowingly causes another to reasonably fear imminent bodily injury by using or displaying a deadly weapon.  T.C.A. §§ 39-13-101(a)(2), -102(a)(1)(A)(iii).  A deadly weapon per se includes "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury."  T.C.A. § 39-11-106(a)(6)(A).

The gun the Defendant held to the back of Mr. Blackwell's head is per se a deadly weapon.  By holding it to Mr. Blackwell's head, the Defendant intentionally or knowingly caused Mr. Blackwell to reasonably fear imminent bodily injury.  The evidence is sufficient to sustain the Defendant's conviction.

## III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____ S/ *ROBERT W. WEDEMEYER* _____
ROBERT W. WEDEMEYER, PRESIDING JUDGE